Slip Op. 14-106

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DUPONT TEIJIN FILMS CHINA LIMITED, DUPONT HONGJI FILMS FOSHAN CO., LTD., DUPONT TEIJIN HONGJI FILMS NINGBO CO., LTD., and DUPONT TEIJIN FILMS U.S. LIMITED PARTNERSHIP,** | |
| Plaintiffs, | |
| **TIANJIN WANHUA CO., LTD.,** | |
| Consolidated Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 13-00229** |
| Defendant, | |
| **TERPHANE, INC., MITSUBISHI POLYESTER FILM, INC., and SKC, INC.,** | |
| Defendant-Intervenors. | |

## OPINION

[Motion for judgment on the agency record in antidumping administrative review granted regarding valuation of recycled input and brokerage and handling expenses; Commerce's final results in all other respects sustained.]

Dated: September  11, 2014

John D. Greenwald and Jonathan M. Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiffs.  With them on the brief were Robert C. Cassidy and Thomas M. Beline.

David J. Craven, Riggle & Craven, of Chicago, IL, argued for plaintiff-intervenor.  With him on the brief were David A. Riggle and Saichang Xu.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division,

U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Carrie A. Dunsmore, Trial Attorney.  Of counsel on the brief was Michael T. Gagain, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Restani, Judge: This matter is before the court on the motions for judgment on the agency record pursuant to USCIT Rule 56.2 filed by plaintiffs DuPont Teijin Films China Limited, DuPont Hongji Films Foshan Co., Ltd., DuPont Teijin Hongji Films Ningbo Co., Ltd., and DuPont Teijin Films U.S. Limited Partnership (collectively "DuPont") and consolidated plaintiff Tianjin Wanhua Co., Ltd. ("Wanhua").  DuPont and Wahua challenge various aspects of the Department of Commerce's ("Commerce") final results in the third antidumping duty administrative review of polyethylene terephthalate film, sheet, and strip ("PET film") from the People's Republic of China ("PRC").  See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 35,245 (Dep't Commerce June 12, 2013) ("Final Results").  DuPont contends that Commerce erred in calculating its dumping margin, alleging that Commerce misvalued DuPont's recycled PET chips, indirect selling expenses, and brokerage and handling expenses.  Mem. of Points and Auths. in Supp. of Pls.' Mot. for J. on the Agency R., ECF No. 46-2 ("DuPont Br.").  Wanhua challenges Commerce's selection of mandatory respondents, which did not include Wanhua, and Commerce's decision to assign DuPont's rate to Wanhua.  Mem. in Supp. of Mot. of Consol. Pl. Tianjin Wanhua Co., Ltd. for J. on the Agency R., ECF No. 48-1 ("Wanhua Br.").  DuPont and Wanhua also challenge Commerce's use of the targeted dumping analysis in administrative reviews.  DuPont Br. 1–2 n.2; Wanhua Br. 15–19. Defendant United States ("the government") argues that the Final Results are based on

substantial evidence and are in accordance with law.  Def.'s Resp. in Opp. to Mots. for J. upon

the Admin. R., ECF No. 57 ("Gov. Br.").  For the reasons stated below, the court remands in part

and sustains in part the <u>Final Results</u>.

## INTRODUCTION

Commerce published an anitdumping duty order covering PET film from the PRC on

November 10, 2008.  <u>Polyethylene Terephthalate Film, Sheet, and Strip from Brazil, the</u>

<u>People's Republic of China and the United Arab Emirates: Antidumping Duty Orders and</u>

<u>Amended Final Determination of Sales at Less than Fair Value for the United Arab Emirates</u>, 73

Fed. Reg. 66,595 (Dep't Commerce Nov. 10, 2008).  Following requests from several interested

parties, Commerce initiated an administrative review of that order on December 23, 2011,

covering the period of November 1, 2010, through October 31, 2011.  <u>Initiation of Antidumping</u>

<u>and Countervailing Duty Administrative Reviews and Request for Revocation in Part</u>, 76 Fed.

Reg. 82,268, 82,269, 82,273 (Dec. 30, 2011).  On February 8, 2012, Commerce selected as

mandatory respondents the two largest exporters by volume, DuPont and Shaoxing Xiangyu

Green Packing Co., Ltd. ("Green Packing").[1]  Memorandum Pertaining to Respondent Selection

at 7, PD 35 (Feb. 8, 2012) ("Respondent Selection Memo").  In determining the largest exporters

by volume, Commerce relied on data from U.S. Customs and Border Protection ("CBP") and

voluntarily submitted quantity and value ("Q&V") data from several companies that Commerce

found rebutted the CBP data as it pertained to those companies.  Respondent Selection Memo at

---

[1] Commerce initially selected only DuPont Teijin Films China Limited and Green Packing as mandatory respondents. Memorandum Pertaining to Respondent Selection at 7, PD 35 (Feb. 8, 2012).  Commerce ultimately collapsed DuPont Teijin Films China Limited, DuPont Hongji Films Foshan Co., Ltd., and DuPont Teijin Hongji Films Ningbo Co., Ltd. into a single entity.  <u>See</u> Decision Memorandum for Preliminary Results at 3, PD 233 (Dec. 3, 2012).

5–6.

Before the agency, disputes arose over the valuation of DuPont's reprocessed waste PET

film that was reintroduced into the production process ("recylced PET chips"), the calculation of

DuPont's indirect selling expenses, the calculation of DuPont's brokerage and handling

("B&H") expenses, and Commerce's use of the so-called "targeted dumping" methodology,

among other issues.  Issues and Decision Memorandum for the Final Results of the 2010–2011

Administrative Review at 18–33, A-570-924 (June 5, 2013), available at

http://enforcement.trade.gov/frn/summary/prc/2013-13985-1.pdf (last visited Sept. 3, 2014)

("I&D Memo").  Wanhua also argued that it should have been chosen as a mandatory respondent

and given its own rate.  See id. at 3–8.  In the Final Results, Commerce calculated a weighted

average dumping margin of 0.00% for Green Packing and 12.80% for DuPont.  Final Results, 78

Fed. Reg. at 35,247.  In calculating the margin for cooperative separate rate respondents not

selected for individual review, including Wanhua, Commerce relied on the margin calculated for

DuPont, because it was the only rate for a mandatory respondent that was not zero or de minimis.

I&D Memo at 8.  Wanhua thus received DuPont's rate of 12.80%.  See Final Results, 78 Fed.

Reg. at 35,247.

DuPont challenges three aspects of the Final Results: 1) Commerce's decision to value

DuPont's recycled PET chips the same as its virgin PET chips without providing any by-product

offset was arbitrary and unsupported by substantial evidence; 2) Commerce's rejection of

DuPont's proposed indirect selling expense ratio was unsupported by evidence and not in

accordance with law; and 3) Commerce erred in calculating DuPont's B&H expenses by relying

on data that was not the most contemporaneous data on the record, including expenses for two

documents that DuPont generates internally, and failing to segregate shipping costs into per-container and per-shipment costs.  DuPont Br. 10–33.  DuPont also adopts Wanhua's challenge to Commerce's use of the targeted dumping analysis in administrative reviews.  Id. at 1–2 n.2; Wanhua Br. 15–19.

Wanhua raises three challenges to Commerce's mandatory selection process: 1) Commerce lacked the authority under 19 U.S.C. § 1677m(a) to limit the number of mandatory respondents in this case because the number of respondents was not "large,"[2] and thus all respondents should have been reviewed; 2) Commerce acted arbitrarily and unreasonably in relying on inconsistent data in selecting the mandatory respondents, namely by relying on a mix of CBP data and voluntary Q&V data, when Commerce should have relied on a single data source to make this determination; 3) Wanhua should have been selected as a mandatory respondent in lieu of, or in addition to, DuPont because DuPont's margin was not representative of Wanhua's rate, as DuPont's margin was subject to manipulation by a U.S. producer of PET film and DuPont sold certain quantities of PET film in the U.S. after further manufacturing.

---

[2] 19 U.S.C. § 1677m(a) (2012) provides in relevant part:

In a . . . review under section 1675(a) of this title in which [Commerce] has, under section 1677f-1(c)(2) of this title . . ., limited the number of exporters or producers examined, . . . [Commerce] shall establish . . . an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination under such section[] who submits to [Commerce] the information requested from exporters or producers selected for examination, if—

(1) such information is so submitted by the date specified—(A) for exporters and producers that were initially selected for examination . . .; and
(2) the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.

Wanhua Br. 6–12.  Wanhua also makes a more general argument that it was unfair and

unreasonable for Commerce to assign DuPont's rate to Wanhua because the potential

manipulation of DuPont's margin and DuPont's further manufacturing activities rendered

DuPont's rate unrepresentative of Wanhua's commercial reality.  Id. at 12–14.  Finally, should

the court reject its arguments that it should receive its own rate, Wanhua argues that it should be

given DuPont's corrected rate if DuPont is successful on any of its challenges.  Id. at 15.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).  "The court shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

**I.        Recycled PET Chips Valuation**

A.        Background

The PRC is considered by Commerce to be a non-market economy[3] ("NME").  In NME

antidumping[4] duty cases, Commerce "shall determine the normal value of the subject

merchandise on the basis of the value of the factors of production utilized in producing the

---

[3] A nonmarket economy country is "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18).

[4] Dumping is defined as the sale of goods at less than fair value, calculated by a fair comparison between the export price or constructed export price and normal value.  See 19 U.S.C. §§ 1677(34), 1677b(a).

merchandise." 19 U.S.C. § 1677b(c)(1).   In calculating normal value, "the valuation of the

factors of production shall be based on the best available information regarding the values of

such factors in a market economy country or countries considered to be appropriate by the

administering authority."  Id.  These surrogate values are to be based, "to the extent possible,"

upon data from an economically comparable country that is a "significant producer[] of

comparable merchandise."  Id. § 1677b(c)(4).  The surrogate values at issue in this case were

used to compute DuPont's normal value, representing the cost of production for DuPont had it

operated in a hypothetical market economy.  See id. § 1677b(c)(1).

        "Nowhere does the statute speak directly to any methodology Commerce must employ to

value the factors of production, indeed the very structure of the statute suggests Congress

intended to vest discretion in Commerce by providing only a framework within which to work."

Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23 CIT 479,

481, 59 F. Supp. 2d 1354, 1357 (1999); see QVD Food Co. v. United States, 658 F.3d 1318,

1323 (Fed. Cir. 2011) (recognizing that Commerce is entitled to deference in interpreting the

undefined term "best available information").  Nonetheless, selection of the best available

information must be in line with the overall purpose of the antidumping statute, which the Court

of Appeals for the Federal Circuit has explained to be "determining current margins as

accurately as possible."  Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir.

1990); see also Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994)

("[T]here is much in the statute that supports the notion that it is Commerce's duty to determine

margins as accurately as possible, and to use the best information available to it in doing so.").

In calculating normal value in the NME context, the particular aim of the statute is to determine

the non-distorted cost of producing the subject merchandise.  See Lasko Metal Prods., Inc. v.

United States, 16 CIT 1079, 1081, 810 F. Supp. 314, 316–17 (1992).

      Some producers produce by-products as part of their production process.  In some cases,

these by-products are used as inputs in the same, or other, production processes of a company.  If

a good subject to an antidumping order is produced using a by-product from a prior production

run, Commerce must somehow account for the by-product when calculating normal value.  See

19 U.S.C. § 1677b(c)(1).  The antidumping statute, however, does not require a particular

method of accounting for by-products.  See id. § 1677b(c).

      In cases where by-products are reused as inputs for producing the same good, double

counting of input costs can occur.  The cost of the raw material from which the by-product is

derived is included in the calculation of normal value when the raw material is first used.

Double counting of costs can occur if Commerce assigns a value to the raw material and then

another cost to the recycled raw material without providing some form of offset to account for

the fact that the recycled material did not need to be purchased.[5]  Double counting should be

avoided, as it does not provide a fair price comparison.  Holmes Prods. Corp. v. United States, 16

CIT 628, 632, 795 F. Supp. 1205, 1208 (1992).

      Commerce has used two methods to avoid double counting recycled by-product inputs.

First, Commerce has assigned a zero value to by-products that are reused as inputs in the

production process, for purposes of calculating normal value, as there is no additional material

cost for the recycled input.  See e.g., E.I. Dupont De Nemours & Co. v. United States, 22 CIT

---

[5] Of course, Commerce can account for any processing costs incurred by the company in converting the raw material into the recycled version of the input.

220, 225, 4 F. Supp. 2d 1248, 1253 (1998) (accepting as reasonable SKC's method of valuing

recycled PET chips at zero); Polyethylene Terephthalate Film, Sheet, and Strip From the

Republic of Korea; Final Results of Antidumping Duty Administrative Review, 60 Fed. Reg.

42,835, 42,836 (Dep't Commerce Aug. 17, 1995) ("PET Film from Korea") (valuing recycled

chips at zero because the cost of producing recycled chips has been captured in the cost of

production for virgin chips).  More recently, however, Commerce's practice generally has been

to grant the producer a credit or offset for by-products generated in the manufacturing process

that are either sold or reintroduced into production, instead of valuing the recycled input at zero.

See e.g., Mittal Steel Galati S.A. v. United States, 31 CIT 1776, 521 F. Supp. 2d 1409 (providing

an offset for recycled scrap input after Commerce's decision to assign a surrogate value to

recycled inputs was found to be unreasonable in Mittal Steel Galati S.A. v. United States, 31 CIT

1121, 1130, 502 F. Supp. 2d 1295, 1303 (2007)); Guangdong Chemicals Imp. & Exp. v. United

States, 30 CIT 1412, 1426, 460 F. Supp. 2d 1365, 1376 (2006) (applying a credit for by-products

made in the manufacturing process of sebacic acid).

      Dupont's PET film is produced using two forms of a single material input: virgin PET

chips and recycled PET chips (derived from prior production runs).  DuPont Br. 4.  In the

preliminary results of this review, Commerce did not grant Dupont a by-product offset for the

recycled PET chips generated during the PET film manufacturing process in calculating normal

value.  Decision Memorandum for Preliminary Results at 16, PD 233 (Dec. 3, 2012)

("Preliminary Results Memo").  Commerce, however, did not assign any value to the recycled

PET chips used in production.  See I&D Memo at 18–19.

      Commerce, in the Final Results, decided to include recycled PET chips as a factor of

production for normal value, and it assigned the recycled chips the same value as virgin PET

chips.  See id. at 19–21.  Commerce admitted that, theoretically, DuPont's recycled chips

reintroduced into production should be offset by the quantity of recycled chips produced, but

Commerce failed to do so, alleging that DuPont did not provide support for the quantity of by-

product generated.  Id. at 19.

        DuPont challenges Commerce's valuation of the recycled PET chips at the same value as

virgin PET chips.  DuPont Br. 2.  DuPont alleges that Commerce's determination is not in

accordance with the law because it unreasonably departs from Commerce's past practice of

valuing recycled chips at zero, a practice the court has sustained in other cases.  Id. at 13–15.

Additionally, DuPont contends that Commerce arbitrarily treated it differently from other parties

in this proceeding, specifically Green Packing, who was not assigned a value for recycled PET

chips because it did not report its usage of recycled PET chips.  Id. at 15.  Next, DuPont argues

that Commerce impermissibly double counted the cost of recycled PET chips based upon a

misunderstanding of DuPont's position, alleging that Dupont wanted to completely exclude the

chips as a factor of production.  Id. at 16–18.  DuPont asserts that the recycled chips should be

valued at zero because the cost of purchasing virgin PET chips encompasses the cost of the

recycled PET chips and the costs of reprocessing waste PET film into recycled chips are

captured elsewhere.  Id. at 18.  In response to Commerce's assertion that DuPont failed to

substantiate its offset request, DuPont contends that it did not request a by-product offset or

provide an alternate surrogate value, as it believed the recycled PET chips would be valued at

zero.  Id. at 19–20; Pl.'s Reply to Def.'s Resp. to Mot. for J. on the Agency R. 12, ECF No. 64

("DuPont Reply").

B.      Analysis

Commerce unreasonably assigned a surrogate value to recycled PET chips equivalent to virgin PET chips while failing to give DuPont a by-product offset for recycled PET chips produced, resulting in double counting of the recycled PET chips.  See Holmes, 16 CIT at 632, 795 F. Supp. at 1208; Mittal Steel, 31 CIT at 1125–32, 502 F. Supp. 2d at 1299–1305. Commerce acknowledged that it had valued recycled PET chips at zero in prior proceedings, and that this had been upheld by the court.  See I&D Memo at 20.  Commerce explained that applying the same valuation in these proceedings, however, would lead to inaccurate margins. These explanations are unpersuasive.

First, Commerce explained that because each product DuPont manufactures requires different amounts of recycled PET chips and because the record did not show that the by-product reintroduced into production for any particular product matched the by-product generated during the production of that product, it was improper to exclude the by-product input on the basis that it is balanced by the by-product output.  Id. at 19–20.  The underlying concern appears to be that cost shifting can occur by taking recycled PET chips generated from one product and reintroducing it into another product line to reduce the cost of manufacturing that second product, presumably to obtain a lower dumping margin.  These same concerns, however, were raised in E.I. Dupont and were rejected by Commerce and the court because there was no evidence that this type of cost shifting was occurring.  PET Film from Korea, 60 Fed. Reg. at 42,835–36; E.I. Dupont De Nemours, 22 CIT at 225.  Commerce did not cite any evidence that such cost shifting occurred here, and the government concedes that Commerce made no such finding.  See Gov. Br. 29.

Second, Commerce asserted that assigning a zero value to the recycled PET chips would undervalue DuPont's overhead costs, as the surrogate overhead ratio used by Commerce in calculating normal value is multiplied by the cost of manufacturing, which includes raw materials, labor, and energy. I&D Memo at 20. Commerce was concerned that by valuing the recycled chips at zero, the raw costs of the raw materials would be undervalued. Id. But the full value of the raw materials in the recycled chips is captured in the initial costs of the virgin chips, which is already included in this calculation, and Commerce did not dispute DuPont's contention that the other costs in reprocessing the waste film into recycled PET chips were already included in the labor and energy factors. The court has previously held that assigning zero value to recycled PET, but including the costs of processing the waste into recycled PET chips, "reasonably capture[s] the value of recycled PET chips re-introduced into the production process." E.I. DuPont, 22 CIT at 225 (citing E. I. DuPont De Nemours & Co. v. United States, 20 CIT 373, 377–78, 932 F. Supp. 296, 300-01 (1996)). Commerce has not provided any reasonable explanation for coming to the opposite conclusion in this case.

Finally, the government argues that "[t]o value a material input at zero in a nonmarket economy case would be equivalent to removing that input altogether from the calculation of normal value." Gov. Br. 15. According to the government, this would violate 19 U.S.C. § 1677b(c)(3)(B), which requires Commerce to value the "quantities of raw materials employed." Gov. Br. 15 (citing I&D Memo at 19). But zero is a value. The surrogate value analysis is designed to determine DuPont's costs of production as if it operated in a hypothetical market economy. See Rhodia, Inc. v. United States, 25 CIT 1278, 1285, 185 F. Supp. 2d 1343, 1351 (2001). Assuming that DuPont operated in a market economy, it still would not have to

pay for PET chips that are recycled from its prior production run.  Thus, assigning zero as the

material costs of the recycled chips is consistent with the statute.

Commerce's double counting of the recycled PET chips is clearly unreasonable in the

light of DuPont's reasonable alternative of valuing the recycled chips at zero.  See Holmes, 16

CIT at 632, 795 F. Supp. at 1208.  Commerce should "reconsider its approach, and adopt a

methodology that does not result in double-counting costs, insofar as reasonably avoidable."[6]  Id.

## II.     Commerce's Calculation of DuPont's Brokerage and Handling Costs

### A.     Selection of the 2011 Doing Business Report

DuPont challenges Commerce's use of "Doing Business 2011: Economy Profile

Indonesia" ("Doing Business 2011"), to calculate the brokerage and handling ("B&H") surrogate

---

[6] The court notes that Commerce, after it refused to value the recycled chips at zero, declined to provide a by-product offset for the recycled chips generated, explaining that DuPont did not support with adequate accounting records the quantities of the by-product chips claimed in the worksheets DuPont submitted to Commerce.  I&D Memo at 19–20.  At oral argument, DuPont attempted to tie various documents in the record together to address Commerce's concerns, but it does not appear that such an explanation was provided to Commerce in the first instance.  On the other hand, it does not appear that DuPont was made aware of the alleged deficiencies of its responses until the Final Results.  See 19 U.S.C. § 1677m(d) (requiring that Commerce to "promptly inform [a] person submitting [a deficient] response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency").  In fact, the by-product issue was largely irrelevant to DuPont until Commerce issued the Final Results, as Commerce previously had valued the recycled chips at zero and thus there was no need for an offset.  Cf. Qingdao Taifa Group Co. v. United States, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1237 (2009) (holding that exhaustion doctrine did not apply when Commerce changed its position in the final results, explaining that a party "is not required to predict that Commerce [will] accept other parties' arguments and change its decision").  Because Commerce's double counting of the recycled chips was unreasonable when DuPont offered a reasonable alternative in valuing the recycled chips at zero, the court need not determine whether DuPont satisfied Commerce's requests in supporting the by-product quantities claimed in the worksheets.  On remand, should Commerce prefer to apply a by-product offset, rather than value the recycled chips at zero, in order to remedy the double counting, Commerce may reopen the record for DuPont to supplement or clarify its earlier submissions regarding the claimed offset if so necessary.

value.  DuPont Br. 28–29.  DuPont suggests that "Doing Business 2013: Economy Profile

Indonesia" ("Doing Business 2013") was a more contemporaneous source to value B&H because

it contained 2011 information covering ten months of the period of review, whereas Doing

Business 2011 contained 2010 data that only overlapped with two months of the period of

review.  Id. at 29.

      Commerce's practice generally treats valuation information contemporaneous with the

period of review as the best available information, and Commerce will select the most

contemporaneous information available when all other factors are held equal.  Shakeproof

Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 30 CIT 1173, 1177–79

(2006); aff'd, 228 F. App'x 1001 (Fed. Cir. 2007).  Commerce selected Doing Business 2011,

published by the World Bank, to calculate the surrogate value for B&H.  I&D Memo at 24.

Doing Business 2011 contained data from 2010.  Id. at 25.  Commerce found that Doing

Business 2011 offered the best available information for valuing B&H because, as Commerce

often states, the data were based on broad market averages, were publicly available, were free of

taxes and duties, and were contemporaneous with the POR.  Id. at 24.  Commerce also examined

Doing Business 2013, but concluded that this report was not the best available information

because it contained B&H information that was not specifically dated.  Id. at 24–25.  Because

Doing Business 2011 contained 2010 data, Commerce reasoned that the data contained in Doing

Business 2013 was from 2012, which was after the period of review.  Id. at 25.

      Commerce's decision to reject Doing Business 2013 was reasonable, as it is unknown

whether that data was contemporaneous with the period of review.  Doing Business 2013 does

not specifically provide the date for the data used to calculate the B&H costs.  I&D Memo at

24–25.  Although Doing Business 2013 technically contains 2011 information, and in fact

contains data from 2004-2013, this information is a chart giving historical data for various

indicators and does not contain a breakdown of the B&H costs for 2011.  See Letter from

Cromwell & Morning LLP to Acting Sec. of Commerce Pertaining to DuPont Companies

Additional Surrogate Data, PD 254 (Jan. 7, 2013).  There is no basis to conclude that because

Doing Business 2013 contains a historical data chart with data spanning ten years, including

2011, the B&H costs were specifically from 2011.  Commerce reasonably concluded that the

data was likely from 2012, because the Doing Business 2011 data was from the previous year,

2010.  See I&D Memo at 25.  Data from 2012 would not be contemporaneous with the period of

review. Doing Business 2011 contains the necessary breakdown of costs and clearly labels the

data as being from 2010, which is contemporaneous with at least part of the period of review.

See Memo from IA to File Pertaining to Interested Parties Surrogate Memo-Part 3 Exhibit 7, PD

236 (Dec. 3, 2012) ("B&H Methodology").  Thus, the court concludes that Commerce's decision

to use Doing Business 2011 as the most contemporaneous data source for the surrogate B&H

value is supported by substantial evidence and is in accordance with the law.

      B.      Adjustment of Document Expenses

      B&H expenses include the time and costs necessary to complete every procedure for

exporting goods, including document preparation, customs clearance and technical control, and

port and terminal handling.  See id.  Doing Business 2011 lists five documents included in the

document preparation costs: memorandum of understanding, packing list, bill of lading,

commercial invoice, and customs export declaration.  Id.  The document preparation cost,

however, is not separated into costs for each specific document; rather, it lists only the total cost

for all five documents.  Id.

DuPont argues for a proportional reduction in the document preparation expense because DuPont internally produces two of the documents included in the document preparation value and therefore does not incur expenses for those documents.  DuPont Br. 29–30.  Commerce will usually make adjustments to calculations when data are clearly identified.  I&D Memo at 25.  Commerce did not dispute that DuPont internally produced two of the documents included in the document preparation expense.  See I&D Memo at 25.  Commerce explained, however, that Doing Business 2011 contained an aggregate figure for document preparation and there was no way to determine the cost of any single document within that aggregate figure.  I&D Memo at 25.  Because the costs of each document could not be separated, Commerce included the entire value of the document preparation expense component in calculating B&H costs.  Id.  DuPont alleges that by including the full value of all documents, Commerce chose an "admittedly distorted" value as opposed to a value that was "potentially distorted."  DuPont Br. 32.  DuPont argues that in selecting a value that Commerce knew was distorted, Commerce's calculation was unlawful.  Id. at 31.  The court disagrees.

Commerce acted reasonably in using the entire document preparation value in calculating B&H.  The documents DuPont produces internally could comprise a large or small portion of the aggregate document preparation expense.  Because the document costs are not separated, but are given in an aggregate figure, there is no way to discern on this record the relative value of the documents and whether or not a proportional reduction would be appropriate.  DuPont provided no information regarding the relative values of the documents included in the document preparation expense, so Commerce had no basis to subtract expenses from the aggregate figure.

For example, if the two documents accounted for a very small percentage of the overall

document expenses, DuPont's proposed methodology could result in an even greater distortion

than the one used by Commerce.  Because Commerce had no way to discern whether DuPont's

proposed proportional adjustment would lead to any greater accuracy, Commerce's use of the

entire aggregate document preparation expense value is supported by substantial evidence and in

accordance with the law.

C.      Segregation of "Per-Shipment" and "Per-Container" Costs

DuPont challenges Commerce's calculation of B&H costs based on a shipment of one

container.  DuPont Br. 32.  DuPont alleges that Commerce's method of assuming that a shipment

contains one container overvalues DuPont's B&H document preparation expenses and other

expenses that are incurred per shipment.  Id. at 32–33.  DuPont claims that it often ships multiple

containers in one shipment and therefore incurs only one set of customs clearance and technical

control expenses ("customs clearance costs") and one set of document preparation expenses for a

shipment of multiple containers.  Id. at 33; Case Brief of DuPont Companies at 28, CD 138 (Jan.

28, 2013) ("DuPont Case Br.")  DuPont instead proposed that Commerce separate the

components of B&H and allocate them as either "per-shipment" or "per-container" expenses.

DuPont Case Br. at 28.

As explained above, Commerce relied on Doing Business 2011 to calculate a surrogate

value for B&H.  I&D Memo at 24.  Doing Business 2011 surveyed freight forwarders, shipping

lines, customs brokers, port officials, and banks on the costs and procedures to ship certain

goods.  B&H Methodology.  The World Bank uses the survey results to calculate and report

values for various exporting and importing expenses.  See id.  The reported figures are based on

exporting and importing a standardized cargo of goods in a 20-foot, full container load weighing

ten tons.  Id.  Commerce totaled the components of the B&H costs applicable to the shipments

here, and converted the B&H cost into a per kilogram value based on the weight of a filled

twenty-foot container so the rate could be scaled up or down based on the kilograms involved in

a shipment.  Gov. Br. 49.  This resulted in a surrogate value of $0.0544/kg for all B&H costs.

B&H Methodology; DuPont Case Br. at 24.  When DuPont objected to this methodology on the

grounds that it overstated the customs clearance costs and document preparation expenses,

Commerce replied that making adjustments to specific components of the aggregate figure

would distort the calculation, and there was no way to go behind the data to determine the

specific cost elements that were reported.  I&D Memo at 26.  Additionally, Commerce asserted

that because the underlying survey data came from many diverse entities that ship across

borders, the aggregate figure accounted for both companies that ship one container and

companies that ship multiple containers per shipment, like DuPont.  Id.; Gov. Br. 49.

        Commerce's B&H calculation rests on an assumption that the $210 for document

preparation expenses and the $169 for customs clearance costs mentioned in the report "was

derived from a formula by which the exporter pays [these expenses] based on the weight of the

goods, which simply is not representative of reality."  See CS Wind Vietnam Co., Ltd. v. United

States, 971 F. Supp. 2d 1271, 1295 (CIT 2014).  Accordingly, Commerce's methodology

incorrectly assumes that a shipment weighing less will incur lower document preparation and

customs clearance costs, while a shipment weighing more will incur higher preparation costs.

Common sense indicates that a half-full, twenty-foot container would incur the same document

preparation and customs clearance costs as a full twenty-foot container of a single type of good.

The court has recognized previously that increasing the surrogate value for B&H proportionally based on the weight of the shipment or the size of the container may not always be reasonable. See Since Hardware (Guangzhou) Co. v. United States, 911 F. Supp. 2d 1362, 1380–81 (CIT 2013).  Commerce's reasoning is not based on simple logic, and the analysis from Since Hardware applies here.  In converting the document preparation expenses and customs clearance costs to a per kilogram value based on the weight of a hypothetical twenty-foot container, and multiplying that value by the weight of DuPont's actual shipments, Commerce has applied a proportional increase in the B&H costs.  Commerce has failed to explain why document preparation and customs clearance costs would change depending on the size or weight of the shipment.  If DuPont, for example, were to ship five full twenty-foot containers, it would incur document preparation and customs clearance costs for five containers, when realistically DuPont should pay these expenses once, as all five containers are contained in one shipment. Commerce's position is contrary to common sense and commercial reality.  Although the court understands that Commerce commonly converts all surrogate values into a per kilogram amount for use in calculating dumping margins, its method of doing so here, based on the weight of the containers and not based on the shipment as a whole, is unreasonable and unsupported by substantial evidence.  One reasonable conversion methodology appears to be to calculate a per kilogram surrogate value allocating the $210 document cost and the $169 customs clearance cost over the weight of an entire shipment.  Accordingly, the court remands this issue to Commerce for recalculation.

**III.     Indirect Selling Expense Ratio**

   A.      Background

   Commerce is required to make certain adjustments to a respondent's reported constructed

export price[7] in order to properly assess the amount by which normal value exceeds that price.

See 19 U.S.C. § 1677a(c)–(d).  Adjustments are made because a respondent's reported home

market prices and U.S. prices "represent prices in different markets affected by a variety of

differences in the chain of commerce," and the adjustments are made "in an attempt to

reconstruct the price at a specific, common point in the chain of commerce, so that value can be

fairly compared on an equivalent basis."  SKF USA Inc. v. INA Walzlager Schaeffler KG, 180

F.3d 1370, 1373 (Fed. Cir. 1999) (internal quotation marks omitted).  One of the adjustments

made to constructed export price in order to make an "apples to apples" comparison is to deduct

indirect selling expenses.  See 19 U.S.C. § 1677a(d)(1)(D).

   Indirect selling expenses are those costs that "would be incurred by the seller regardless

of whether the particular sales in question are made, but reasonably may be attributed (at lest in

part) to such sales," while direct selling expenses are expenses that "bear[] a direct relationship

to" the particular sales in question.  See Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103–316, at 823–24 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4164.  Commerce generally allocates indirect selling expenses by

multiplying each sale price by the ratio of total indirect selling expenses to total sales revenue.

See Diamond Sawblades Mfrs. Coal. v. United States, Slip Op. 13-130, 2013 Ct. Intl. Trade

---

   [7] Constructed export price is the first sale by a seller affiliated with the producer to an
unaffiliated purchaser in the United States.  See 19 U.S.C. § 1677a(b).

LEXIS 137, at *13 n.4 (CIT Oct. 11, 2013).  Commerce is not obligated by statute to calculate

this ratio in any particular way.  Commerce generally accepts proposed allocation methodologies

that are calculated on as specific a basis as feasible and do not distort or inaccurately reflect the

indirect selling expenses.  See 19 C.F.R. § 351.401(g) (2014).  Commerce will not reject an

allocation method solely because it contains expenses incurred or priced adjustments made

regarding sales of non-subject merchandise.  19 C.F.R. § 351.401(g)(4).

        In its submissions to Commerce, DuPont provided Commerce with a calculation of its

indirect selling expense ratio that excluded expenses related solely to non-subject merchandise.

See DuPont Section C and D Supplemental Questionnaire Response, PD 149, CD 71 (May 25,

2012).  The pool of remaining (presumably mixed subject and non-subject) expenses were

multiplied by a ratio aimed at excluding non-subject merchandise expenses, and then put over a

denominator of sales revenue of subject merchandise to calculate the overall indirect selling

expense ratio.  DuPont Reply 18.

        Commerce instead chose to recalculate DuPont's indirect selling expenses using a

different ratio from that provided by DuPont.  I&D Memo at 22–23.  Commerce did not subtract

expenses related solely to non-subject merchandise, but instead multiplied all indirect selling

expenses (for subject and non-subject merchandise) by a ratio of sales of subject merchandise

over total sales in an attempt to exclude expenses relating to non-subject merchandise.  DuPont

Reply 17–19.  Commerce used the same denominator as did DuPont (sales of subject

merchandise) to calculate the indirect selling expense ratio.  Id. at 18.  In rejecting DuPont's

method, Commerce relied on DuPont's inability to segregate the indirect selling expenses

remaining after DuPont excluded certain expenses related solely to non-subject merchandise.

I&D Memo at 22.  As a result, Commerce found the ratio did not accurately reflect DuPont's

indirect selling expenses.  Id.

      DuPont challenges Commerce's decision to reject DuPont's methodology for its indirect

selling expense ratio.  DuPont Br. 22.  DuPont puts forth two arguments to support its position

that Commerce acted improperly in rejecting its indirect selling expense ratio calculation.  First

DuPont argues that Commerce acted contrary to 19 C.F.R. § 351.401(g)(4) which states that

Commerce will not reject a methodology solely because is includes expenses related to non-

subject merchandise.  Id. at 26.  DuPont alleges that Commerce's rejection of DuPont's

methodology because DuPont could not segregate the remaining expenses is inconsistent with

this regulation.  Id.  Next, DuPont asserts that Commerce has a past practice of excluding

expenses solely relating to non-subject merchandise from the pool of indirect selling expenses,

and that by not excluding these expenses, Commerce acted inconsistently with its judicially

affirmed practice.  Id. at 26–27; see also id. at 24–25 (citing U.S. Steel Corp. v. United States,

712 F. Supp. 2d 1330 (CIT 2010); NSK Ltd. v. United States, 29 CIT 1, 17–18, 358 F. Supp. 2d

1276, 1291 (2005); NSK Ltd. v. United States, 27 CIT 56, 109–10, 245 F. Supp. 2d 1335,

1378–79 (2003); and Timken Co. v. United States, 26 CIT 590, 598–99, 209 F. Supp. 2d 1373,

1381 (2002)). DuPont believes its calculation, which first excludes expenses solely related to

non-subject merchandise is much more accurate than Commerce's calculation, which includes

expenses related to non-subject merchandise.  DuPont Br. 24–28.  DuPont identified many

expenses related to non-subject merchandise including sales, customer service, administration,

and IT costs largely related to manufacturing non-subject merchandise.  Id. at 26–27; I&D

Memo at 22–22.

The government maintains that Commerce acted properly in rejecting DuPont's proposed

calculation methodology for its indirect selling expenses as distortive.  Gov. Br. 30.

Additionally, the government argues that DuPont failed to exhaust its administrative remedies

with regard to its argument that Commerce's conduct was inconsistent with its regulations.  Id. at

34–35.

      B.    Analysis

Regarding DuPont's claim that the rejection of its methodology violated 19 C.F.R.

§ 351.401(g)(4), the court holds that DuPont failed to exhaust its administrative remedies,

because DuPont never made this argument to Commerce.  A party that is dissatisfied with

Commerce's preliminary results has the option of filing a case brief to express its disapproval in

a final attempt to persuade Commerce before the publication of final results.  19 C.F.R.

§ 351.309(c)(1)(ii).  Within the case brief, the dissatisfied party "must present all arguments that

continue in the submitter's view to be relevant" for Commerce's final results.  19 C.F.R.

§ 351.309(c)(2).  In addition to Commerce's regulations that address the exhaustion requirement

by requiring parties to submit a case brief containing all arguments, Congress has instructed that

"the Court of International Trade shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d).  If a party fails to put forth a relevant argument

before Commerce in its case brief, then that argument is typically considered waived and will not

be considered by a court on appeal.  Corus Staal BV v. United States, 502 F.3d 1370, 1378 n.4

(Fed. Cir. 2007) (citing Cemex, S.A. v. United States, 133 F.3d 897, 902 (Fed. Cir. 1998)).

Commerce rejected DuPont's calculation of its indirect selling expense ratio in the Preliminary

Results, and DuPont did not present any argument based on 19 C.F.R. § 351.401(g)(4) in its case

brief following the publication of the <u>Preliminary Results</u>.  <u>See</u> DuPont Case Br. 2–24.  DuPont

thus waived this particular argument.

　　The court rejects DuPont's reliance on the exception to the exhaustion doctrine for pure

questions of law.  <u>See</u> DuPont Reply Br. 21 n.10.  Commerce's regulation precludes the agency

from rejecting an "allocation method <u>solely</u> because the method includes expenses incurred, or

price adjustments made, with respect to sales of merchandise that does not constitute subject

merchandise or a foreign like product (whichever is applicable)."  19 C.F.R. § 351.401(g)(4)

(emphasis added).  Determining Commerce's reasoning for rejecting DuPont's calculation of its

indirect selling expense ratio necessarily requires a court to "delve[] into factual issues

implicating the evidence on the administrative record," and thus the exception for pure questions

of law does not apply.  <u>Asahi Seiko Co., Ltd. v. United States</u>, 755 F. Supp. 2d 1316, 1330 (CIT

2011).

　　The court also rejects DuPont's reliance on Commerce's past practice in challenging

Commerce's decision here.  DuPont claims that Commerce has accepted similar methodologies

in an attempt to show that Commerce erred in finding that DuPont's proposed ratio was

distortive.  <u>See</u> DuPont Br. 24–27.  Although the cases cited by DuPont facially involved

methodologies similar to the one proposed by DuPont, they stand only for the proposition that

Commerce will exclude expenses related to non-subject merchandise from the numerator of the

ratio if the party requesting that methodology can adequately show that its proposed

methodology is not distortive, which the respondents in those cases were able to do on the facts

of those cases.  As explained above, Commerce's default methodology is to multiply each sale

price by the ratio of total indirect selling expenses to total sales revenue.  Although the default

methodology included expenses that were not incurred in the sale of subject merchandise,

DuPont has not shown that its proposed alternative methodology is clearly less distortive.

DuPont was not able to adequately show the breakdown of the expenses remaining in the

numerator of the indirect selling expense ratio (i.e., whether they applied to non-subject

merchandise, subject merchandise, or both proportionately).  I&D Memo at 23.  DuPont has not

convinced the court that this finding by Commerce was unsupported by substantial evidence.

The failure to show the breakdown of the remaining expenses in the numerator is especially

problematic because DuPont's methodology further reduced the numerator by a ratio of subject

merchandise sales over total sales in an attempt to leave only expenses incurred in the selling of

subject merchandise in the numerator.  See DuPont Reply 19.  But it appears that this

proportional reduction would make sense only if the expenses remaining in the numerator

applied proportionally to subject and non-subject merchandise.  Without knowing what the

remaining expenses related to, Commerce could not tell if this additional adjustment was

distortive, or how great the distortion might be.

Commerce has discretion in choosing methodologies for calculating indirect selling

expenses, and DuPont has not shown that its proposed methodology was clearly better than the

methodology chosen by Commerce.  The court cannot say that Commerce's choice of

methodology over DuPont's proposed methodology was unreasonable, and therefore the court

sustains Commerce's calculation of DuPont's indirect selling expenses.

## IV.    Targeted Dumping

In comparing export prices to normal value in order to calculate a dumping margin,

Commerce's default methodology is the average-to-average ("A-A") methodology.  19 C.F.R.

§ 351.414(b)–(c).  In investigations, Commerce may apply the average-to-transaction ("A-T")

methodology if, and only if, Commerce finds a "pattern of export prices . . . for comparable

merchandise that differ significantly among purchasers, regions, or periods of time" and

Commerce explains why the A-A methodology (or the rarely used transaction-to-transaction

("T-T") methodology) does not take such differences into account.  19 U.S.C.

§ 1677f-1(d)(1)(B).  That pattern of "export prices . . . that differ significantly among purchasers,

regions, or periods of time" is commonly referred to as targeted dumping.  Wanhua contends that

because the targeted dumping inquiry is described only in the subsection entitled

"Investigations" in § 1677f-1(d) and is absent in the subsection entitled "Reviews," Congress

intended for the targeted dumping analysis to be limited to investigations only, and thus

Commerce erred in applying it in this administrative review.  Wanhua Br. 15–19.  DuPont

incorporated this challenge by reference in its brief.  DuPont Br. 1–2 n.2.  This claim lacks merit.

19 U.S.C. § 1677f-1(d)(2), the subsection entitled "Reviews," does nothing more than

clarify that Commerce should use monthly averages when it uses the A-T methodology in

administrative reviews.[8]  "Section 1677f-1(d)(2) is otherwise completely silent as to how

Commerce should conduct its determination of less than fair value in reviews, leaving

Commerce substantial discretion as to the methodologies it wishes to employ."  Timken Co. v.

United States, 968 F. Supp. 2d 1279, 1286 n.7 (CIT 2014); see also CP Kelco Oy v. United

States, 978 F. Supp. 2d 1315, 1322 (CIT 2014).  And because the statute does not evidence any

---

[8] 19 U.S.C. § 1677f-1(d)(2) provides: "In a review under section 1675 of this title, when comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale."

intent by Congress to withhold any authority to engage in the targeted dumping analysis from

Commerce when conducting reviews, the cases cited by Wanhua in its brief regarding the

expressio unius doctrine are distinguishable.  See CP Kelco Oy, 978 F. Supp. 2d at 1322–24

(rejecting party's reliance on cases invoking expressio unius doctrine to challenge Commerce's

use of targeted dumping analysis in review); Timken Co., 968 F. Supp. 2d at 1286 n.7 (same).

The court holds that Commerce did not abuse its discretion by relying on its practice in

investigations, which includes the use of the targeted dumping analysis, in selecting a calculation

methodology to use in this review.  JBF RAK LLC v. United States, 991 F. Supp. 2d 1343,

1347–49 (CIT 2014); CP Kelco Oy, 978 F. Supp. 2d at 1322; Timken Co., 968 F. Supp. 2d at

1286 n.7.  Commerce's use of the targeted dumping analysis in this review therefore is sustained.

**V.      Mandatory Respondent Selection**

        Wanhua raises several challenges to Commerce's decision to select DuPont as a

mandatory respondent to the exclusion of Wanhua.  First, Wanhua argues that because there was

a small number of potential respondents, Commerce's decision to limit the number of mandatory

respondents, with Wanhua excluded, was unlawful.  Wanhua Br. 7–9.  Second, Wanhua argues

that Commerce improperly relied on a combination of export data from Customs and Border

Protection and voluntarily submitted quantity and value ("Q&V") data in selecting the

mandatory respondents; according to Wanhua, Commerce should have relied on a single,

consistent set of data.  Id. at 9–10.  Finally, Wanhua argues that it should have been selected as a

mandatory respondent and given its own rate to avoid the unfairness caused by basing Wanhua's

rate on DuPont's rate, which allegedly was subject to manipulation by a U.S. petitioner.  Id. at

10–12.

In its brief, the government argues that Commerce properly limited the number of

mandatory respondents, because the number of potential respondents was too large to

individually review each of them.  Gov. Br. 50–56.  The government additionally argues that

Commerce reasonably used the CBP and Q&V data to select DuPont and Green Packing as the

mandatory respondents.  Id. at 56–58.  The government also contends that there is no evidence

that a U.S. producer actually manipulated DuPont's dumping margins and thus there was no

unfairness to Wanhua when it was assigned DuPont's rate.  Id. at 59–62.  The government

further contends that to the extent Wanhua suggests that DuPont's further manufacturing

activities in the United States render DuPont's rate unrepresentative, this argument was not

preserved before the agency and, in any event, the rate given to Wanhua was not based on any

DuPont sales that involved further manufacturing in the United States.  Id. at 62–63.

After the issue was raised by the court at oral argument, the government encourages the

court to reject the challenges to respondent selection on the ground that Wanhua failed to

exhaust its administrative remedies by not seeking voluntary respondent status.  Def.'s

Supplemental Br. 9–11, ECF No. 81.  The court agrees that Wanhua has failed to exhaust its

administrative remedies in challenging Commerce's selection of mandatory respondents.

Congress has directed that "the Court of International Trade shall, where appropriate,

require the exhaustion of administrative remedies."  28 U.S.C. § 2637.  This statute reflects "a

congressional intent that, absent a strong contrary reason, the court should insist that parties

exhaust their remedies before the pertinent administrative agencies."  Corus Staal, 502 F.3d at

1379.  Requiring exhaustion of administrative remedies protects agency authority and promotes

judicial efficiency.  Id.  "[T]he exhaustion doctrine 'acknowledges the commonsense notion of

dispute resolution that an agency ought to have an opportunity to correct its own mistakes with

respect to the programs it administers before it is haled into federal court.'" Id. at 1380 (quoting

McCarthy v. Madigan, 503 U.S. 140, 145 (1992)).

        The court repeatedly has required that a party aggrieved by not being selected as a

mandatory respondent must request to be reviewed as a voluntary respondent under 19 U.S.C.

§ 1677m(a) before it can challenge the mandatory respondent selection process in court.  See,

e.g., Union Steel Mfg. Co. v. United States, 837 F. Supp. 2d 1307, 1331 (CIT 2012) ("[A]

respondent, in order to exhaust administrative remedies, must pursue the statutory process for

receiving an individually-determined margin before challenging before the court the

Department's decision not to assign an individual margin to it."); Amanda Foods (Vietnam) Ltd.

v. United States, 807 F. Supp. 2d 1332, 1348 (CIT 2011) ("[A] plaintiff . . . that goes forward

with a review but does not request voluntary respondent status, has also failed to exhaust its

administrative remedies."); Schaeffler Italia S.r.l. v. United States, 781 F. Supp. 2d 1358, 1364

(CIT 2011); Asahi Seiko Co., 755 F. Supp. 2d at 1326–27.  Congress has provided an

administrative avenue for a party that is not selected but wishes to be reviewed in 19 U.S.C.

§ 1677m(a).  That section provides in relevant part:

> In a . . . review under section 1675(a) of this title in which [Commerce] has, under
> section 1677f-1(c)(2) of this title . . ., limited the number of exporters or producers
> examined, . . . [Commerce] shall establish . . . an individual weighted average
> dumping margin for any exporter or producer not initially selected for individual
> examination under such section[] who submits to [Commerce] the information
> requested from exporters or producers selected for examination, if—
>> (1) such information is so submitted by the date specified—(A) for exporters
>> and producers that were initially selected for examination . . .; and
>> (2) the number of exporters or producers who have submitted such
>> information is not so large that individual examination of such exporters or

> producers would be unduly burdensome and inhibit the timely completion of
> the investigation.

Id.  The statute thus provides a potential administrative remedy to a respondent who was not

chosen as a mandatory respondent but desires a rate based on its own sales, and the court will not

order Commerce to assign a respondent an individual margin unless it has attempted to avail

itself of this administrative remedy.

    Here, Wanhua did not request voluntary respondent status.  First, Wanhua missed the

deadline for submitting its Section A Questionnaire response if it wanted to be treated as a

mandatory respondent.  I&D Memo at 7–8 & n.30; Oral Arg. at 1:21:50, 1:23:30.  Second, when

Wanhua did submit information from which Commerce potentially could determine an

individual margin for Wanhua, it specifically stated that it was not submitting this information as

a request for voluntary respondent status.  Wanhua Comments on the Section A Response of

DuPont Group at 2 n.1, CD 46 (Apr. 6, 2012) ("Wanhua Sec. A. Cmts."); see also I&D Memo at

7–8.  Wanhua noted in its submission to Commerce that it assumed such a request would have

been futile in the light of Commerce's refusal to accept two voluntary respondent requests in the

prior administrative review of PET film from the PRC and repeated that claim at oral argument.

Wanhua Sec. A. Cmts. at 2 n.1; Oral Arg. at 1:22:15.  This futility argument is unavailing.

    "The bar for a futility exception [to the exhaustion requirement] is high, requiring more

than unlikeliness."  Amanda Foods, 807 F. Supp. 2d at 1348 (citing Corus Staal, 502 F.3d at

1379).  The court consistently has rejected claims that the failure to request voluntary respondent

status should be excused because such an act would have been futile.  See id. at 1349; Union

Steel, 837 F. Supp. 2d at 1332–33; Schaeffler Italia, 781 F. Supp. 2d at 1364–65; Asahi Seiko,

755 F. Supp. 2d at 1327–28.  Although it does not appear to be common, the government cites in

its supplemental brief a number of instances in which requests for voluntarily respondent status

were granted.  See Def.'s Supplemental Br. at 5–8 & accompanying notes.  The court therefore

concludes that a request for voluntary status was not "obviously useless" at the relevant time,

Corus Staal, 502 F.3d at 1379, and the futility exception does not excuse Wanhua's failure to

exhaust this administrative remedy.

Had Wanhua requested and been granted individual review as a voluntary respondent, its

various challenges to the respondent selection process would be moot.  Wanhua thus failed to

avail itself of an opportunity for Commerce to correct its alleged mistakes in not choosing

Wanhua as mandatory respondent.  See Corus Staal, 502 F.3d at 1380; Amanda Foods, 807 F.

Supp. 2d at 1348.  Because the issues raised by Wanhua before the court pertaining to

respondent selection might have been nullified had Wanhua requested voluntary respondent

status, the court will not entertain Wanhua's request for a remand to Commerce to assign it an

individual rate based on these alleged errors.[9]

---

[9] The court noted at oral argument that the number of respondents potentially subject to
review in this case does not appear to be a "large number" for purposes of 19 U.S.C.
§ 1677f–1(c).  That section requires individual examination of "each known exporter and
producer of the subject merchandise.  Id. § 1677f–1(c)(1).  Only when "it is not practicable to
make individual weighted average dumping margin determinations [of each such exporter or
producer] because of the large number of exporters or producers involved in the investigation or
review" may Commerce limit the number of mandatory respondents.  Id. § 1677f–1(c)(2).
Although the court has strong doubts that the record would support Commerce's determination
that the number of potential respondents in this case (between five and seven) is a "large
number," the court need not decide this issue because Wanhua failed to exhaust its
administrative remedies.
    The court also notes that Commerce appears to be changing its respondent selection
methodology as a result of judicial decisions or otherwise.  See Antidumping Proceedings:
Announcement of Change in Department  Practice for Respondent Selection in Antidumping
                                                                                    (continued...)

## VI.     Use of DuPont's Rate as Wanhua's Rate

More generally, Wanhua contends that it is unfair and unreasonable for Wanhua to be assigned DuPont's rate because that rate was subject to manipulation by a U.S. producer and DuPont's pricing and sale structure is unrepresentative of Wanhua's commercial reality. Wanhua Br. 12–15.  Again, the government contends that there was no evidence of actual manipulation of DuPont's rate, that Wanhua failed to preserve its claim that DuPont's further manufacturing activities rendered its rate unrepresentative, and that Wanhua's rate was not based on any DuPont sales that involved further manufacturing in the United States.  Gov. Br. 59–63.

The court rejects Wanhua's more general contention that it was unfair to assign DuPont's rate to Wanhua.  First, as explained above, Wanhua did not request to be reviewed as a voluntary respondent.  Had Wanhua requested and obtained individual review as a voluntary respondent, its concerns with being assigned DuPont's rate would have been alleviated by the agency and there would be no need for litigation on this issue before the court.  Wanhua thus failed to exhaust its administrative remedies.

Even if this more general argument was not forfeited by the failure to request voluntary respondent status, this argument lacks merit.  In response to Wanhua's allegations that DuPont's rate was subject to manipulation by a U.S. producer, Commerce found that there was "no factual information on the record to support the allegation of actual or potential U.S. price manipulation."  I&D Memo at 17.  Commerce's determination was reasonable, as Wanhua still

---

[9](...continued)
Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings, 78 Fed. Reg. 65,963 (Dep't Commerce Nov. 4, 2013). The court expresses no opinion as to whether in the future making a request to be examined as a voluntary respondent will be futile.

has not put forth specific evidence showing any improper manipulation of DuPont's rate. Despite this, Wanhua states that "the mere suggestion of the likelihood of manipulation of the dumping margin by [Dupont U.S.] makes it inequitable for [Commerce] to apply DuPont-China's rate to Wanhua." Wanhua Br. 14. This simply amounts to speculation, which is insufficient to establish that Commerce's determination was unreasonable and/or arbitrary. Cf. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute substantial evidence.") (internal quotation marks omitted). As Wanhua acknowledged in its Response to the Section A Questionnaire of DuPont-China, DuPont-U.S. also could have been motivated to reduce, rather than increase, DuPont's dumping margins. Wanhua Sec. A. Cmts. at 6–7; see also Reply of Consol. Pl. Tianjin Wanhua Co., Ltd. at 9, ECF No. 67 (acknowledging same). And Wanhua has not cited any authority that would otherwise bar the use of a mandatory respondent's rate when setting the all others rate if the mandatory respondent is affiliated with a U.S. producer. See I&D Memo at 17. Due to the lack of any evidence of actual manipulation, Commerce's reliance on Dupont's rate in assigning margins to the non-examined respondents, including Wanhua, was reasonable, supported by substantial evidence and otherwise in accordance with law.

The court also rejects Wanhua's claim that DuPont's further manufacturing in the United States rendered DuPont's rate unrepresentative because Wanhua did not raise this issue in its case brief to Commerce and, in any event, it appears that the further manufactured U.S. sales did not factor into DuPont's dumping margin. See Case Brief of Tianjin Wanhua Co., Ltd. et al. at 7–8, PD 261 (Jan. 28, 2013); Preliminary Results Memo at 13–15.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Final Results</u> are remanded in part for Commerce to reconsider the valuation of DuPont's recycled PET chips and to recalculate DuPont's brokerage and handless expenses.  In all other respects, Commerce's <u>Final Results</u> are sustained. Because Wanhua was assigned DuPont's rate in the <u>Final Results</u>, any change to DuPont's margin following remand shall be applied to Wanhua's rate as well.[10]  Commerce shall file its remand results by November 10, 2014.  The parties shall have until December 8, 2014, to file objections, and the government shall have until December 23, 2014, to file a response.

 /s/ Jane A. Restani
Jane A. Restani
Judge

Dated: September 11, 2014
     New York, New York

---

[10] The government agrees with Wanhua's argument that if DuPont's margin is revised pursuant to this litigation, then Wanhua's rate also should be revised.  Gov. Br. 63 n.10.